# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JUSTIN GOLDMAN,

                  Plaintiff,

        - against -

BREITBART NEWS NETWORK, LLC;
HEAVY, INC.; TIME, INC.; YAHOO, INC.;
VOX MEDIA, INC.; GANNETT COMPANY, INC.;
HERALD MEDIA, INC.; BOSTON GLOBE
MEDIA PARTNERS, LLC; NEW ENGLAND
SPORTS NETWORK, INC.,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SECOND AMENDED COMPLAINT
FOR COPYRIGHT INFRINGEMENT**

17 Civ. 3144 (KBF)

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. This is an action for copyright infringement pursuant to 17 U.S.C. 106(5) based on the unauthorized for-profit display by separate websites owned and operated by each of the defendants of a photograph created by plaintiff that is protected by a federal copyright duly registered with the United States Copyright Office.

## POSSIBLY RELEVANT DISCLOSURE

2. There is currently pending in this Court an action for, in part, copyright infringement pursuant to 17 U.S.C. 106(5) that was commenced by plaintiff against other defendants based on their unauthorized for-profit display of the same photograph at issue in this action. In that action, a specific legal issue -- which may or may not be presented in this action -- is the subject of a motion to dismiss that is currently being briefed (Goldman v. Advance Publications, Inc., et al,

S.D.N.Y., 16 Civ. 9031 (ALC) ("Advance"). In commencing this action, plaintiff does not believe the pendency of that action presents any impediment to or reason to delay the progress of this action.

## THE PARTIES

3. Plaintiff Justin Goldman is a resident of the City and State of New York.

4. Each of the defendants owns and operates one or more for-profit websites and each is amenable to suit in this district.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1338.

6. This Court has personal jurisdiction over each defendant because either a) it is a resident of this district or b) if it is not, the requirements of CPLR 302(a)(3)(i) and/or (ii) are fully satisfied.

7. Venue in this district is proper pursuant to 28 U.S.C. §§1391(a) and 1400(a).

## UNDERLYING FACTS

8. On July 2, 2016, plaintiff took a photograph of NFL superstar Tom Brady (and others) ("the Photo"). A copy of the Photo is annexed hereto as Exhibit "A." The Photo was registered with the United States Copyright Office with Certificate No. Vau 1-250-526.

9. Each defendant, without any legal authority to do so, prominently displayed, for each's own for-profit purposes, a copy of the Photo.

10. As of this filing, plaintiff is aware of some, but not necessarily all, of each defendant's infringing displays of the Photo. Plaintiff expects that through initial disclosures and/or discovery the full extent of each defendant's infringing displays of the Photo will be established. For now,

2

the following will identify the infringing uses of which plaintiff is currently aware:

a. Annexed hereto as Exhibit "B" is a screenshot of an infringing display of the Photo made by defendant Breitbart News Network, LLC.

b. Annexed hereto as Exhibit "C" is a screenshot of an infringing display of the Photo made by defendant Heavy, Inc.

c. Annexed hereto as Exhibit "D" are two screenshots of infringing displays of the Photo made by defendant Time, Inc.

d. Annexed hereto as Exhibit "E" are two screenshots of infringing displays of the Photo made by defendant Yahoo, Inc.

e. Annexed hereto as Exhibit "F" is a screenshot of an infringing display of the Photo made by defendant Vox Media, Inc.

f. Annexed hereto as Exhibit "G" is a screenshot of an infringing display of the Photo made by defendant Gannett Company, Inc.

g. Annexed hereto as Exhibit "H" is a screenshot of an infringing display of the Photo made by defendant Herald Media, Inc.

h. Annexed hereto as Exhibit "I" are two screenshots of infringing displays of the Photo made by defendant Boston Globe Media Partners, LLC.

i. Annexed hereto as Exhibit "J" is a screenshot of an infringing display of the Photo made by defendant New England Sports Network, Inc.

11. Each of the defendants' infringing displays derived originally from the exact same digital file of the copyrighted Photo that was initially introduced into the Internet without plaintiff's knowledge or consent, and all the defendants' infringing displays occurred within a

3

limited period of time. Further, because the allegations addressed to all defendants are identical, there are common questions of law. Also, joinder of the defendants in this case will promote judicial economy while protecting the parties for a just, speedy, and inexpensive outcome.

## THE 'EMBED' ISSUE

12. Several defendants in this case have indicated that they believe the practice called "embedding" may be applicable to this case. That practice is addressed at length in plaintiff's Complaint in Advance, a copy of which is annexed hereto as Exhibit "K" and which to the extent relevant is incorporated by reference into this paragraph of this Complaint. Modified extracts from that Complaint are set forth immediately below.

13. The "embed" notion derives from a single 2007 Ninth Circuit decision -- Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) ("Perfect 10") -- that did not remotely involve underlying facts that are even arguably analogous to the facts here. That decision is discussed further below.

14. This case involves remarkably simple facts. First fact: plaintiff is the owner of a registered copyright for a photograph he took of NFL superstar Tom Brady (and others) on July 2, 2016. Second fact: Each of the defendants owns popular for-profit general-interest websites that, without any authority from plaintiff, prominently displayed the Photo in full and in full color. Plaintiff alleges that each defendant, by thus displaying the Photo, violated his exclusive right under Section 106(5) of the U.S. Copyright Act to "to display the copyrighted work publicly."

15. In dramatic juxtaposition to this case -- where the defendants deliberately sought-out and prominently "showed" the Photo for its own for-profit purposes -- Perfect 10 only concerned a claim of copyright infringement based on a) the presentation by Google's search engine of low-

4

resolution "thumbnails" of copyrighted photos that its search technology indiscriminately swept-up and b) Google's providing to its visitors hyperlink "instructions" showing how they could, if they so desired -- by volitionally "clicking" on those "instructions" -- locate for themselves the full photos represented by those thumbnails, which photos become visible only as a result of that volitional clicking.

16. The defendants' primary -- if not only -- purpose in invoking Perfect 10 to justify their otherwise infringing displays of the Photo is to avoid the legal responsibility that would otherwise result therefrom. Exactly contrary to the defendants' proffered reading of that case, plaintiff contends that Perfect 10, properly read, eviscerates the defendants' asserted interpretation of it and supports the conclusion that the defendants' unauthorized displays of the Photo were actionable infringements.

17. If the defendants helped themselves to the Photo from, e.g., a magazine or newspaper, their displays of it would (at least in the absence of a "fair use" defense) indisputably constitute actionable copyright infringement, and probably willful copyright infringement. But, instead, the defendants will apparently assert that because they specifically sought-out, obtained, and displayed the Photo electronically -- by "embedding" -- they had an immutable and perpetual free pass to prominently display the Photo as they did, along with every other copyrighted photo ever created, with no obligation to their copyright owners and with no legal consequences. To their credit, the defendants in Advance have acknowledged that the legal result they seek in that case is "absurd."

18. As stated in Perfect 10, "Google operates a search engine, a software program that automatically accesses thousands of websites (collections of webpages) and indexes them within a

5

database stored on Google's computers. When a Google user accesses the Google website and types in a search query, Google's software searches its database for websites responsive to that search query.  Google then sends relevant information from its index of websites to the user's computer.  Google's search engines can provide results in the form of text, images, or videos."

19.  Further, "[t]he Google search engine that provides responses in the form of images is called 'Google Image Search.'  In response to a search query, Google Image Search identifies text in its database responsive to the query and then communicates to users the images associated with the relevant text.  Google's software cannot recognize and index the images themselves.  Google Image Search provides search results as a webpage of small images called 'thumbnails,' which are stored in Google's servers.  The thumbnail images are reduced, lower resolution versions of full-sized images stored on third-party computers."

20.  Further, "[w]hen a user clicks on a thumbnail image, the user's browser program interprets HTML instructions on Google's webpage.  These HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen.  The window has two separate areas of information.  The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text.  The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail . . . .  By following the HTML instructions to access the third-party webpage, the user's browser connects to the website publisher's computer, downloads the full-size image, and makes the image appear at the bottom of the window on the user's screen.  Google does not store the images that fill this lower part of the window and does not communi-cate the images to the user; Google simply provides HTML instructions directing a user's browser

to access a third-party website. However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window. Thus, the user's window appears to be filled with a single integrated presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website. The process by which the webpage directs a user's browser to incorporate content from different computers into a single window is referred to as 'in-line linking.' [citation omitted] The term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer."

21. According to the Court, "Plaintiff Perfect 10 markets and sells copyrighted images of nude models." It claimed a) that static thumbnail renditions of its copyrighted photos were visible on Google's Image Search and that those renditions constituted direct copyright infringement, and b) that the full images that resulted from the user's volitional clicking on the thumbnails also constituted direct copyright infringement.

22. The Court held that Google's static thumbnail renditions of Perfect 10's photos and its providing "instructions" to Google's visitors to locate full versions of the photos did not constitute direct copyright infringement. Specifically, the Court explicitly articulated (and circumscribed) its holding as follows (emphasis added): "our ruling that a computer owner does not display a copy of an image when it communicates **only** the HTML address of the copy." By so forcefully limiting its ruling to that very narrow circumstance -- "communicates **only** the HTML address of the copy" -- the Court made clear that if a website communicates (shows) more than "the HTML address," as the defendants did here, that website will have indeed "displayed" the copyrighted work in question.

8

23. In reaching its conclusion that Google's providing of "instructions" to enable users to locate and see the full photos represented by the thumbnails did not constitute direct copyright infringement, the Court, addressing the specific facts before it, articulated a "server test" that held that the photos in question were not "stored" on Google's computers and therefore could not lead to a finding of direct infringement by Google. Both the district court's and the Ninth Circuit's opinions emphasized that the so-called "server test" -- originally promulgated by the district court in that case -- was specifically responsive and applicable to the unique circumstances (and legal vulnerabilities) of search engines like Google's.

24. Explaining the limitations of its ruling, the Court declared (emphasis added): "Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen."

25. The Ninth Circuit explicitly explained why it found that Google did not violate the copyright owner's "exclusive right . . . to display the copyrighted work publicly" [17 U.S.C. 106(5)] as follows (emphasis added): "Google's activities do not meet this definition because Google transmits or communicates only an address which directs a user's browser to the location where a copy of the full-size image is displayed. Google does not communicate a display of the

work itself."

26. To prevail here, the defendants must assert that <u>Perfect 10</u>'s holding on the facts before it that "a computer owner does not display a copy of an image when it communicates <u>only</u> the HTML address of the copy" somehow <u>sub silentio</u> immunizes their own volitional full displays -- "communication" -- of the Photo on radically different facts. Some of those factual differences are:

a. Instead of a thumbnail of the Photo, the defendants prominently displayed the Photo in full and in full color.

b. The defendants provided no "instructions" of any kind to its visitors to tell them how and where to find the Photo, if they so chose.

c. The defendants provided no "address which directs a user's browser to the location where a copy of the full-size image is displayed."

d. Instead of providing any such "instructions" or "address" to its visitors, so that they could -- by "clicking" -- independently and volitionally choose whether or not to view the full photos represented by a thumbnail, the defendants themselves specifically chose to seek out the Photo, import it to their websites, and display it for all visitors to their sites to see, whether those visitors wanted to see it or not. In short, the defendants unilaterally did the necessary "clicking" for all their visitors.

e. While Google indiscriminately swept-up Perfect 10's photos as part of its search engine operation, and did not in any way single out those photos for its entirely passive thumbnail renditions of them, the defendants singled out the Photo for their prominent displays of it on their websites.

10

f. While Google's business (as here relevant) is to indiscriminately and passively provide thumbnails of millions of photos that are swept-up by its search technology, the defendants' business (as here relevant) is to publish for-profit editorial websites for which they select and display specific content to further their for-profit purposes.

g. While the Court in Perfect 10 emphasized that Google's "HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen," there is no such 'window' on the defendants' prominent displays of the Photo.

h. Further, while the Court in Perfect 10 also emphasized that "the term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer," and while the defendants may assert that their displays of the Photo constituted such "framing," there is no such "framing" on their prominent displays of the Photo.

27. Plaintiff's undersigned counsel has previously presented the following hypothetical to (prior) counsel for the defendants in Advance: "A copyright lawyer walks into a bar -- named 'Remember 9/11.' At each end of the bar is an oversized computer screen, and each constantly shows (displays?) the exact same visual image: a full-screen, full-color rendition of the (much litigated) photo of the flag-raising at Ground Zero.[1] The source for one computer is a 'copy' of the photo; the source for the other is a 'link' to a distant website, which may or may not have authority to offer the photo. Is one an infringement, and the other not? Can one (at least hypothetically) be enjoined, and the other not? Should these (otherwise identical) displays be

---

[1] See, e.g., North Jersey Media Group, Inc. v. Pirro and Fox News Network, LLC, 74 F.Supp. 3d 605 (S.D.N.Y. 2015), 13 Civ. 7153 (ER).

treated wholly differently as a matter of copyright law?"

28. Advance's counsel candidly responded: "While your '9/11 Bar' hypothetical does a good job of showcasing how the server test can be perceivably absurd, it does not address the fact that the language of the Copyright Act [sic] does not consider in-line links to be infringing." Whether the "language" of the Copyright Act in fact mandates the admittedly "absurd" outcome to be urged by defendants here will be the central issue to be decided by this Court in this case. (Second Circuit: "A statute [here, the Copyright Act] should be interpreted in a way that avoids absurd results." United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000).)

29. More recently, Plaintiff's counsel presented a second hypothetical to counsel for the defendants in Advance: "A company named Server, Inc. owns 500 highway billboards in the state of New Jersey, all of which are controlled by computers. The 'Trump for President' campaign -- or, alternatively, the Klan, or maybe just a prominent 'Gentlemen's Club' -- contracts with Server, Inc. to display in full and filling the entire billboards the Ground Zero flag-raising photo, possibly with a legend at the bottom saying 'Brought to you by . . . .' Instead of getting a license from the copyright owner for these 500 displays, the entity chooses the 'embed' method of acquiring and displaying the photo. Questions: Infringement? or Perfectly Legal?"

30. Advance's counsel did not respond to that hypothetical. Here too, if the defendants are to prevail in this case, this Court will necessarily have to find that those 500 uses are "perfectly legal."

31. And here's a third (and final) hypothetical: "It is the seventh game of the World Series -- for these purposes, at Citi Field -- and during the 'seventh inning stretch' the people in charge decide -- without any authority -- to display that same flag-raising photo in full on the jumbotron,

where it is seen by 50,000 people in the stadium and by 100 million people on television. Solely to avoid the (presumably high) license fee that would otherwise be required, it is decided to display the photo through [the] 'embed' process. Questions: Infringement or Perfectly Legal?" For the defendants to prevail in this case, this Court will have to find that that (humongous) display of that copyrighted photo was perfectly legal.

32. The asserted "embed" justification for the defendants' unauthorized prominent displays is, at best, a contorted, out-of-context, highly technical, and exquisitely self-serving extrapolation from that one Google "search engine" case. Except for providing a means for predatory publishers to avoid paying license fees for their increasingly rampant appropriation of copyrighted content, as in this case, the "embed" justification does not even arguably serve any of the purposes of our copyright law -- or any other positive social purpose.

CAUSE OF ACTION FOR COPYRIGHT
<u>INFRINGEMENT AGAINST EACH DEFENDANT</u>

33. Plaintiff incorporates here the contents of Paragraphs 1 through 32 above.

34. The United States Copyright Act grants to all copyright owners the "exclusive right" to "display" their copyrighted works "publicly," 17 U.S.C. 106(5), and the Act defines "display" as "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially." 17 U.S.C. 101. Each defendant separately violated plaintiff's "exclusive right" to "display" the Photo by its separate public display of it without plaintiff's knowledge or consent. Accordingly, each defendant is separately liable to plaintiff for its separate infringement(s) of the registered copyright in the Photo.

13

WHEREFORE, with respect to each act of copyright infringement by each defendant, plaintiff demands judgment against each a) issuing a permanent injunction preventing each defendant from making any further unauthorized use or display of the Photo; b) awarding to plaintiff from each defendant all appropriate damages, including statutory damages, as determined by the Court or jury; c) awarding to plaintiff each defendant's profits attributable to each's infringements; d) awarding to plaintiff his costs and attorneys' fees; and e) awarding such other relief as the Court deems just.

Dated: May 26, 2017

Kenneth P. Norwick (KN4622)
NORWICK & SCHAD
110 East 59th Street
New York, New York 10022
(212) 751-4440
ken@norwickschad.com

Attorneys for Plaintiff

EXHIBIT "A"



Celtics and Tom Brady roll thru to get Durant #Hamptons

EXHIBIT "B"

Skip to content

- Home
- Subscribe

SEARCH | search

- Big Government
- Big Journalism
- Big Hollywood
- National Security
- Tech
- Video
- Sports
- The Wires
- 2016 : The Race

- Breitbart London
- Breitbart Jerusalem
- Breitbart Texas
- Breitbart California
- LOCAL MEETUPS

- Facebook
- Twitter
- RSS

SEARCH | search

# Tom Brady Helping Celtics Recruit Kevin Durant



by Breitbart News 2 Jul 2016 0

2 Jul, 2016 3 Jul, 2016

# SIGN UP FOR OUR NEWSLETTER

- email address

Submit

None other than star New England Patriots quarterback Tom Brady is helping the Boston Celtics recruit NBA superstar Kevin Durant in the Hamptons on Saturday.

# SIGN U

EXHIBIT "C"

Brady & Boston Celtic ×

avy.com/sports/2016/07/tom-brady-and-kevin-durant-boston-celtics-meeting-photo-hamptons-details-who-is-there-twitter-free-agent-when-schedule-presentation/

# leavy

NEWS    SPORTS    ENTERTAINMENT    TECH    GAMING    SHOPPING

Search

Sports

# Tom Brady & Boston Celtics Meeting With Kevin Durant

Published 3:42 pm EDT, July 2, 2016  |  Updated 5:12 pm EDT, July 2, 2016  |  ⚲ 4 Comments  |  By Jonathan Adams  🔥 1.4k

 f **Share** 12     🐦 **Tweet**    G+ **Share**    ✉ **Email**    f **Follow**



**GET THE TOP 5 NEWS STORIES EACH DAY IN YOUR INBOX**

Email Address    Sign Up!

We will never share your email addre

Case 1:17-cv-00140-AJN-SN Document 38-3 Filed 05/26/17 Page 21 of 54

EXHIBIT "D"

▸Subscribe to SI    ▸PENGUINS Champ Package    ▸CAVALIERS Champ

NFL   MMQB   CAMPUS   NBA   MLB   NHL   SOCCER   NCAAF   OLYMPICS   GOLF   MORE   EXTRA MUSTARD   SWIM   FE

M SI

More >

Brady is among the most popular professional athletes to ever play in Boston, having won four Super Bowls and been named the NFL MVP twice.

The Celtics are hoping that his presence will be enough to pull Durant away from Oklahoma City, where the forward appears to be leaning.



t against
ESPYs

e Warriors to
OOP

est news
agency



EM
HEAL

motional
o Atlanta

us/749322866303328256/photo/1



Google Store

Moto 360 - 2nd Ge
Rose Gold

LEARN MORE ➔

ARE   PIN   GPLUS   COMMENT

*Kevin Durant is in search of his first NBA championship, so the Celtics called on a Super Bowl Champion to help in their recruitment.*

The Boston Celtics have the richest history in the National Basketball Association. Winners of 17 championships, Boston could probably sell Kevin Durant on their tradition alone. However, they called in the big guns on Saturday, bringing New England Patriots Super Bowl Champion quarterback Tom Brady to their meeting.

Celtics and Tom Brady roll thru to get Durant #Hamptons



FANSIDED 2w ago

**NBA Rumors: Timberwolves aggressively offer Pau Gasol**



PROMOTED BY THE SOVEREIGN INVESTOR

**U.S. Betrayed: The Real Reason Britain Left The European Union**

Recommended by Outbrain



BLEACHER REPORT 2w ago

**Eric Gordon Reportedly to Sign with Rockets: Latest Contract Details, Reaction**



FANSIDED 2w ago

**NBA Rumors: Kevin Durant strongly considering Warriors**

FANSIDED 2w ago

EXHIBIT "E"

# dy Helped
# ics Recruit
# urant In
# ee Agency



Tom Brady Helped The Celtics Recruit Kevin Durant In Their Free Agency Meeting

Boston's recruitment team for KD in Hampton's @CSNNE @WojVerticalNBA @StoolGreenie @stoolpresidente @sam_amick pic.twitter.com/IEQxO7xCzg
— Rob H (@RCH1I1) July 2, 2016

In a scene fit for an episode of *Ballers* or *Entourage*, Tom Brady was apparently a part of the Boston Celtics pitch to free agency prize Kevin Durant. A picture surfaced of Brady with the Celtics general manager Danny Ainge and players Marcus Smart and Kelly Olynyk that got the internet buzzing. As with all things online, it seemed a little skeptical until multiple reporters confirmed that Brady was indeed a part of the Celtics meeting with Durant.

Confirmed — per multiple sources. Tom Brady is at the Celtics meeting with Kevin Durant.
— Jeff Goodman (@GoodmanESPN) July 2, 2016

usly was exciting for the most renowned Boston sports fan around. Bill Simmons.

What to Read Next

Melania Trump's Claims She
College Are About As Credib
Last Night
The Huffington Post

Why Is No One Telling U.S. Hom
This?
Free Solar Quotes Sponsored

Case 1:15-cv-00940-AKS-ND Document 38-5 Filed 05/26/17 Page 26 of 54

News    Sports    Finance    Celebrity    Answers    Groups    Mobile    More ⌄

Search

MLB    NBA    NHL    Olympics    THE VERTICAL    NCAAF    Golf    NASCAR    Help    Soccer    MMA    NCAAB    Esports    Tennis    Rivals    Boxing    Cycling    WNBA

Brady was part of the biggest story of the NBA's free-agent frenzy this summer, as an official part of the Celtics' pitch to Durant at the Hamptons.

ViralGuppy Sponsored



Celtics and Tom Brady roll thru to get Durant #Hamptons



**US Basketball team opens camp with new faces**
Associated Press



**Pat Riley has an interesting idea fix the NBA's 'superteam' problem**
Business Insider



**Cousins on Durant joining Warri feelings'**
CSN Bay Area



Case 1:125-cv-03949-AUNK SNDoCumentd-38-5Filed1b/05/26/17Pagrage 6fo54

# EXHIBIT "F"

#LOOKIT  #NBA  #PHOTO  NBA

# Tom Brady is trying to help the Celtics convince Kevin Durant to come to Boston

By James Dator 🐦 @James_Dator on Jul 2, 2016, 4:31p  💬9

🐦 TWEET          f SHARE (521)          📌 PIN







LOVE IT

OR YOUR FIRST PAIR IS ON US

GET COMFORTABLE

Case 1:15-cv-00149-ADK-SN Document 6-38-6 Filed 05/26/17 Page 29 of 54

# EXHIBIT "G"



**thebiglead | NBA**



**Protect What Matters Most**

Sponsored by Western Digital

## THE ROUNDUP



↱343 shares

**Roundup: Game of Thrones Narrated By Samuel L. Jackson, Mia Khalifa Loves Washington Sports**

SHARE    TWEET    EMAIL

By: Jason Lisk | July 2, 2016 3:49 pm ET    👍 Like    🐦 Follow @jasonlisk

The Boston Celtics are pulling out all the stops in their recruitment of Kevin Durant. That includes Tom Brady in a kangol hat alongside Danny Ainge as they get ready to pitch Durant during their Hamptons meeting. I know that Oklahoma City and Golden State are the favorites, but this is the kind of X-factor that could swing the entire NBA offseason.



Case 1:25-cv-02940-AJN-SN Document 6-38-7 Filed 05/26/17 Page 31 of 54

EXHIBIT "H"

vw.bostonherald.com/sports/celtics/celtics_insider/2016/07/tom_brady_gives_celtics_an_assist_in_their_pursuit_of_kevin

COMPOSITE - Kevin Durant (Photo via AP), and Tom Brady (Photo by Matt Stone)

  

    2 COMMENTS





The Celtics have apparently brought in a big name that Kevin Durant truly understands.

Tom Brady, caught on camera walking with Danny Ainge, co-owner Steve Pagliuca and several Celtics players to their sales meeting with Kevin Durant in the Hamptons this afternoon, has long had the Oklahoma City star's admiration.

Celtics and Tom Brady roll thru to get Durant #Hamptons

**steve bulpett**

CELTICS
Agent: After 'wake-up call,' Jared Sullinger knows he must change
**mark murphy**

RED SOX
Red Sox phenom Anderson Espinoza has 'got everything'
**michael silverman**

RED SOX
Silverman's Red Sox report card: Highs and lows at the break
**michael silverman**



### TRENDING NOW

CLUBHOUSE INSIDER
Red Sox trade for Drew Pomeranz, give up prospect Anderson Espinoza

LOCAL COVERAGE
Jerry Remy speaks out on accused murderer son

CELTICS

EXHIBIT "I"

Case 1:17-cv-03919-AJN-SN Document 16-38-9 Filed 01/05/26/17 Page 34 of 54

cs pull out the big gu ⨉

tps://www.bostonglobe.com/sports/celtics/2016/07/02/boston-celtics-tom-brady-kevin-durant/5MYd3z1H3Tlfl5Z8hxeVjK/story.html



Celtics and Tom Brady roll thru to get Durant #Hamptons

**You're reading 1 of 5 free articles.** Get UNLIMITED access for only 99¢ per week. **Subscribe now** ⟩

Case 1:25-cv-00940-AJN-SN Document 38-9 Filed 05/26/17 Page 35 of 54

ps://www.boston.com/sports/boston-celtics/2016/07/02/tom-brady-joins-celtics-kevin-durant-pitch-meeting

# boston.com

NEWS   WEATHER   SPORTS   CULTURE   TRAVEL   CARS   REAL ESTATE   MORE

In a picture posted on social media, Patriots quarterback Tom Brady is seen accompanying team president of basketball operations Danny Ainge and co-owner Steve Pagliuca in the Hamptons ahead of Boston's afternoon pitch to Durant.

Kelly Olynyk and Marcus Smart are also with the group in the picture as part of the Celtics' contingent.

Case 1:15-cv-03013-AJN-KSN Document 38-9 Filed 05/26/17 Page 36 of 54

EXHIBIT "J"

Case 1:15-cv-09940-AJN-KSN Document 63-10 Filed 05/26/17 Page 37 of 54



**NESN**   Red Sox   Bruins   Patriots   Celtics   MLB   NHL   NFL   NBA   Cars   Soccer   UFC   WWE   Odds   TV Schedule

New England Patriots quarterback Tom Brady was photographed walking with Danny Ainge and other members of the Celtics before the meeting with Durant.





**Tricky 'Final Jeopardy' Clue About MLB Team Name Stumps Everyone**

**Ronda Rousey Surgery Shocker Puts UFC Return in Limbo**



**Stephen A. Smith Rips Tom Brady After Deflategate Appeal Denial**

**This Freakishly Tall 15-Year-Old Might Be a Future Star**





**Alligator Battles Python on Florida Golf Course**

**10 Reasons Steph Curry Will Never Win Another Championship**





**13 Most Successful NBA Players Ever**

**Football Prodigy Gets Banned From League**

Celtics and Tom Brady roll thru to get Durant #Hamptons




Case 1:15-cv-09242-AJN-KSN Document 63-1 Filed 05/26/17 Page 38 of 54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JUSTIN GOLDMAN,

                Plaintiff,

    - against -

ADVANCE PUBLICATIONS, INC.,
ADVANCE DIGITAL, and ADVANCE
LOCAL,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT FOR
DECLARATORY JUDGMENT
AND COPYRIGHT INFRINGEMENT**

**JURY DEMANDED**

## INTRODUCTION

1. The United States Copyright Act grants to all copyright owners the "exclusive right" to "display" their copyrighted works "publicly," 17 U.S.C. 106(5), and the Act defines "display" as "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially." 17 U.S.C. 101.

2. In this case, plaintiff Justin Goldman ("plaintiff") is such a copyright owner and the defendants ("Advance") are owners of popular for-profit general-interest websites that showed his copyrighted photograph publicly without his knowledge or consent. (Reproductions of those displays are set forth on pages 4 and 5 below.) For that reason, he brings this action for

infringement of that copyrighted photo.

3. Advance claims legal absolution for those infringements by invoking a never-before-asserted in court, much less adjudicated, interpretation of and extrapolation from a single 2007 Ninth Circuit decision that did not remotely involve underlying facts that are even arguably analogous to the facts here. Only for that reason is this case (ostensibly) one of first impression in U.S. copyright law.

4. This case involves remarkably simple undisputed facts. First undisputed fact: plaintiff is the owner of a registered copyright for a photograph he took of NFL superstar Tom Brady (and others) on July 2, 2016 ("the Photo"). Second undisputed fact: Advance owns two popular for-profit general-interest websites -- NJ.com and Masslive.com -- that, without any authority from plaintiff, each prominently displayed the Photo in full and in full color. Plaintiff alleges that Advance, by thus displaying the Photo, violated his exclusive right under Section 106(5) of the U.S. Copyright Act to "to display the copyrighted work publicly."

5. In dramatic juxtaposition to this case -- where Advance deliberately sought-out and prominently "showed" the Photo for its own for-profit purposes -- that 2007 case only concerned a claim of copyright infringement based on a) the presentation by Google's search engine of low-resolution "thumbnails" of copyrighted photos that its search technology indiscriminately swept-up and b) Google's providing to its visitors hyperlink "instructions" showing how they could, if they so desired, locate for themselves the full photos represented by those thumbnails.

6. Advance's primary -- if not only -- purpose in invoking that 2007 case to justify its otherwise infringing displays of the Photo is to avoid the legal responsibility that would otherwise result therefrom. Exactly contrary to Advance's proffered reading of that case,

Case 1:16-cv-09051 Document 1 Filed 11/21/16 Page 3 of 18

plaintiff contends that that Ninth Circuit decision, properly read, eviscerates Advance's

interpretation of it and in fact supports the view that Advance's unauthorized displays of the

Photo were actionable infringements. Accordingly, in part, this case seeks a Declaratory

Judgment establishing that the applicable law requires a finding that Advance's undisputed

unauthorized displays of the Photo constitute infringements of the underlying copyright.

7. Set forth immediately below on successive pages are screenshots of (most of)

Advance's two separate displays of the Photo:


free agency rumors: ×
ww.nj.com/sports/index.ssf/2016/07/nba_free_agency_rumors_celtics_brady_durant.html

-Boston is trying EVERYTHING to land a star.

New England Patriots quarterback Tom Brady joined the Boston Celtics' pitch to superstar free agent forward Kevin Durant. Yes, that Tom Brady.

**Bill Simmons** ✓
@BillSimmons

🟦 Follow

TOM BRADY MIGHT BE AT THE DURANT MEETING AND I HAVE LOST THE ABILITY TO BREATHE AND BLINK SEND HELP NOW

3:40 PM - 2 Jul 2016

↰   ♺ 3,125   ♥ 7,906



Brady joins Boston Celt··  ✕

ww.masslive.com/celtics/index.ssf/2016/07/boston_celtics_rumors_tom_brad.html

iis page

on July 02, 2016 at 3:40 PM, updated July 02, 2016 at 7:37 PM



303 shares

The Boston Celtics hope to throw one heck of a touchdown this summer and picked a brilliant quarterback to help them do it.

According to multiple reports, the team brought New England Patriots superstar Tom Brady to the Hamptons to try pitching free agent Kevin Durant on Saturday afternoon. CSNNE's Abby Chin first tweeted a photo showing Brady with the Celtics' recruiting group, which also included Danny Ainge, Steve Pagliuca, Kelly Olynyk and Marcus Smart.



**Abby Chin** ●
@tvabby

#Celtics breaking out the big guns for KD! TB12 in the Hamptons. @CSNNE imgur.com/Y2R1PpX

3:19 PM - 2 Jul 2016

↩  ⇄ 1,258  ♥ 1,023

5

8. Advance has effectively conceded that if it took the Photo from, e.g., a magazine or newspaper, its displays of the Photo would (at least in the absence of a "fair use" defense) constitute actionable copyright infringement, and probably willful copyright infringement. But, instead, Advance asserts that because it specifically sought-out, obtained, and displayed the Photo electronically -- through a process it calls "embedding" – it had an immutable and perpetual free pass to prominently display the Photo as it did, along with every other copyrighted photo ever created, with no obligation to their copyright owners and with no legal consequences. (Advance is also the owner of such publications as Vogue, Vanity Fair, and The New Yorker magazines, each with its own a treasure-trove of copyrighted photographs and text, all of which will similarly be free for the taking by every website in the world if Advance prevails in this case.) To its credit, Advance has acknowledged that the legal result it will ask this Court to enshrine is "absurd."

## THE PARTIES

9. Plaintiff Justin Goldman is a citizen of the City and State of New York.

10. On information and belief Advance Publications, Inc., Advance Digital, and Advance Local are interrelated commonly-owned business entities headquartered in the City and State of New York.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§1332(a) and 1338. Venue in this district is proper pursuant to 28 U.S.C. §§1391(a) and 1400(a).

## ADVANCE'S UNTESTED 'EMBED' JUSTIFICATION

12. Advance's argument that it should not be held liable for its prominent unauthorized displays of the Photo is predicated entirely on a 2007 decision by the Ninth Circuit, Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) ("Perfect 10"), which had nothing whatever to do with the kind of displays presented by Advance to its visitors on its for-profit editorial websites. Instead, that case involved the Google Search Engine, which made available to its visitors static "thumbnail" renditions of millions of photographs along with "instructions" on how those visitors could, if they so chose -- by "clicking" on the thumbnails -- go to the websites where full photos could be found.

13. As stated by the Court, "Google operates a search engine, a software program that automatically accesses thousands of websites (collections of webpages) and indexes them within a database stored on Google's computers. When a Google user accesses the Google website and types in a search query, Google's software searches its database for websites responsive to that search query. Google then sends relevant information from its index of websites to the user's computer. Google's search engines can provide results in the form of text, images, or videos."

14. Further, "[t]he Google search engine that provides responses in the form of images is called 'Google Image Search.' In response to a search query, Google Image Search identifies text in its database responsive to the query and then communicates to users the images associated with the relevant text. Google's software cannot recognize and index the images themselves. Google Image Search provides search results as a webpage of small images called 'thumbnails,' which are stored in Google's servers. The thumbnail images are reduced, lower resolution versions of full-sized images stored on third-party computers."

7

15. Further, "[w]hen a user clicks on a thumbnail image, the user's browser program interprets HTML instructions on Google's webpage. These HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen. The window has two separate areas of information. The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text. The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail . . . . By following the HTML instructions to access the third-party webpage, the user's browser connects to the website publisher's computer, downloads the full-size image, and makes the image appear at the bottom of the window on the user's screen. Google does not store the images that fill this lower part of the window and does not communicate the images to the user; Google simply provides HTML instructions directing a user's browser to access a third-party website. However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window. Thus, the user's window appears to be filled with a single integrated presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website. The process by which the webpage directs a user's browser to incorporate content from different computers into a single window is referred to as 'in-line linking.' [citation omitted] The term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer."

16 According to the Court, "Plaintiff Perfect 10 markets and sells copyrighted images of nude models." It claimed that static thumbnail renditions of its copyrighted photos were visible on Google's Image Search, and that those renditions constituted direct copyright infringement.

17. The Court held that Google's static thumbnail renditions of Perfect 10's photos and its providing "instructions" to Google's visitors to locate full versions of the photos did not constitute direct copyright infringement. Specifically, the Court explicitly articulated (and circumscribed) its holding as follows (emphasis added): "our ruling that a computer owner does not display a copy of an image when it communicates **only** the HTML address of the copy." By so forcefully limiting its ruling to that very narrow circumstance -- "communicates **only** the HTML address of the copy" -- the Court made clear that if a website communicates (shows) more than "the HTML address," as Advance did here, that website will have indeed "displayed" the copyrighted work in question.

18. In reaching its conclusion with respect to Google's "thumbnails," which conclusion plaintiff does not dispute, the Court, addressing the specific facts before it, articulated a "server test" that held that on those facts Google's static thumbnails of Perfect's 10's photos -- which were indiscriminately swept up by Google's search technology and which were only shown in those static thumbnails -- were not "stored" on Google's computers and therefore could not lead to a finding of direct infringement by Google.

19. Explaining the limitations of its ruling, the Court declared: "Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the

9

infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen."

20. The Ninth Circuit explicitly explained why it found that Google did not violate the copyright owner's "exclusive right . . . to display the copyrighted work publicly" [17 U.S.C. 106(5)] as follows (emphasis added): "Google's activities do not meet this definition <u>because Google transmits or communicates <u>only an address which directs a user's browser to the location</u> <u>where a copy of the full-size image is displayed</u>. Google does not communicate a display of the work itself</u>."

21. Advance asserts that <u>Perfect 10</u>'s holding on the facts before it that "a computer owner does not display a copy of an image when it communicates <u>only</u> the HTML address of the copy" somehow <u>sub silentio</u> immunizes its own volitional full displays -- "communication" -- of the Photo on radically different facts. Some of those factual differences are:

a. Instead of a thumbnail of the Photo, Advance prominently displayed the Photo in full and in full color.

b. Advance provided no "instructions" of any kind to its visitors to tell them how and where to find the Photo.

c. Advance provided no "address which directs a user's browser to the location where a copy of the full-size image is displayed."

d. Instead of providing any such "instructions" or "address" to its visitors, so that they could -- by "clicking" -- separately choose whether or not to view the full photos represented by a thumbnail, Advance itself specifically chose to seek out the Photo, import it to its website, and display it for all visitors to its site to see, whether those visitors wanted to see it or not. In short,

10

Advance unilaterally did the necessary "clicking" for all its visitors.

e. While Google indiscriminately swept-up Perfect 10's photos as part of its search engine operation, and did not in any way single out those photos for its entirely passive thumbnail renditions of them, Advance singled out the Photo for its prominent displays of it on its websites.

f. While Google's business (as here relevant) is to indiscriminately and passively provide thumbnails of millions of photos that are swept-up by its search technology, Advance's business (as here relevant) is to publish for-profit editorial websites for which it selects and displays specific content to further its for-profit purposes.

g. While the Court in Perfect 10 emphasized that Google's "HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen," there is no such 'window' on Advance's prominent displays of the Photo (supra pp 4-5.)

h. Further, while the Court in Perfect 10 also emphasized that "the term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer," and while Advance has asserted that its display of the Photo constituted non-infringing "framing," there is no such "framing" on Advance's prominent displays of the Photo (supra pp. 4-5).

22. Plaintiff's undersigned counsel has previously presented the following hypothetical to counsel for Advance: "A copyright lawyer walks into a bar -- named 'Remember 9/11.' At each end of the bar is an oversized computer screen, and each constantly shows (displays?) the exact same visual image: a full-screen, full-color rendition of the (much litigated) photo of the

11

flag-raising at Ground Zero.[1] The source for one computer is a 'copy' of the photo; the source for the other is a 'link' to a distant website, which may or may not have authority to offer the photo. Is one an infringement, and the other not? Can one (at least hypothetically) be enjoined, and the other not? Should these (otherwise identical) displays be treated wholly differently as a matter of copyright law?"

23. Advance's counsel candidly responded: "While your '9/11 Bar' hypothetical does a good job of showcasing how the server test can be perceivably absurd, it does not address the fact that the language of the Copyright Act [sic] does not consider in-line links to be infringing." Whether the "language" of the Copyright Act in fact mandates the admittedly "absurd" outcome urged by Advance will be the central issue to be decided by this Court in this case. (Second Circuit: "A statute should be interpreted in a way that avoids absurd results." United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000).)

24. More recently, Plaintiff's counsel presented a second hypothetical to Advance's counsel: "A company named Server, Inc. owns 500 highway billboards in the state of New Jersey, all of which are controlled by computers. The 'Trump for President' campaign -- or, alternatively, the Klan, or maybe just a prominent 'Gentlemen's Club' -- contracts with Server, Inc. to display in full and filling the entire billboards the Ground Zero flag-raising photo, possibly with a legend at the bottom saying 'Brought to you by . . . .' Instead of getting a license from the copyright owner for these 500 displays, the entity chooses the 'embed' method of acquiring and displaying the photo. Questions: Infringement? or Perfectly Legal?"

---

[1] See, e.g., North Jersey Media Group, Inc. v. Pirro and Fox News Network, LLC, 74 F.Supp. 3d 605 (S.D.N.Y. 2015), 13 Civ. 7153 (ER).

25. Instead of responding to this hypothetical -- presumably to avoid its same "absurd" characterization -- Advance's counsel advised that it would not address that hypothetical at all. Here too, if Advance is to prevail in this case, this Court will necessarily have to find that those 500 uses are "perfectly legal."

26. And here's a third (and final) hypothetical: "It is the seventh game of the World Series -- for these purposes, at Citi Field -- and during the 'seventh inning stretch' the people in charge decide -- without any authority -- to display that same flag-raising photo in full on the jumbotron, where it is seen by 50,000 people in the stadium and by 100 million people on television. Solely to avoid the (presumably high) license fee that would otherwise be required, it is decided to display the photo through Advance's 'embed' process. Questions: Infringement or Perfectly Legal?" For Advance to prevail in this case, this Court will have to find that that (humongous) display of that copyrighted photo was perfectly legal.

27. Advance's "embed" justification for its unauthorized prominent displays is, at best, a contorted, out-of-context, highly technical, and exquisitely self-serving extrapolation from that one Google "search engine" case. Except for providing a means for predatory publishers to avoid paying license fees for their increasingly rampant appropriation of copyrighted content, as in this case, Advance's "embed" justification does not even arguably serve any of the purposes of our copyright law -- or any other positive social purpose. We will leave it to Advance to explain why it seeks to make freely available through the "embed" dodge the entirety of its own truly invaluable copyrighted assets.[2]

---

[2] A few days before this Complaint was filed, Time Magazine published a "Special Edition" presenting the 100 "Most Influential Images of All Time," at least one of which was created for and first appeared on the cover of Advance's Vanity Fair Magazine. There can be no

28   Advance's prominent unauthorized displays of the Photo add no new meaning or expression to the Photo; contribute no information to the surrounding article; and is otherwise extraneous to any "reporting" function.  As a consequence, Advance's uses of the Photo cannot be said to constitute transformative news reporting.

29   The purpose of Advance's prominent unauthorized displays of the Photo was solely to present the content of that image, in a commercial capacity.

30.   Advance's prominent unauthorized displays of the Photo was not to, and did not, imbue it with a character different from that for which it was created.

32.   Advance's prominent unauthorized displays of the Photo did not alter it at all.

33.   Advance's prominent unauthorized displays of the Photo merely superseded the objects of the Photo, and did not add anything new, with a further purpose or different character, altering the Photo with new expression, meaning, or message.

34.   Advance's prominent unauthorized displays of the Photo displayed the entirety of the Photo.

35.   Advance was not alone in its unauthorized prominent displays of the Photo.  Dozens of other websites also rushed to make their own (also unauthorized) prominent displays of the Photo.  (Those other infringing displays will be the subject of separate litigation.)  That widespread prominent use of the Photo demonstrates the value to those websites of those displays.

---

dispute that if a website appropriated some or all of those photos from that (print) publication, that would constitute direct infringement of the exclusive right to display them.  But because those photos are also available online, http://100photos.time.com, Advance will urge this Court in this case to issue a judicial ruling that will effectively give away -- for free, in perpetuity, for all manner of commercial purposes -- all those truly iconic photos to every website (and bar, billboard, and jumbotron, etc.) that chooses to "embed" them.

36. Advance's (and others') unauthorized prominent displays of the Photo deprived Plaintiff of the license fees he would otherwise have received for such displays and otherwise caused him damage, including by depriving him of the ability to decide for himself the outlets he would authorize to display the Photo.

37. Advance is an experienced and sophisticated media enterprise that knew or should have known that its unauthorized prominent uses of the Photo was not lawful and was not "fair use."

CAUSE OF ACTION FOR A DECLARATORY JUDGMENT

38. Plaintiff incorporates here the contents of Paragraphs 1 through 37 above.

39. Plaintiff is entitled to a Declaratory Judgment declaring that Advance's unauthorized displays of the Photo constitute actionable infringements that are not immunized from infringement consequences because it perpetrated those displays by the process it calls "embedding."

CAUSE OF ACTION FOR WILLFUL COPYRIGHT INFRINGEMENT

40. Plaintiff incorporates here the contents of Paragraphs 1 through 39 above.

41. On the facts set forth above, Advance is separately liable to plaintiff for each of its separate willful infringements of his registered copyright in the Photo.

WHEREFORE, plaintiff demands judgment against Advance a) issuing a Declaration that Advance's unauthorized prominent for-profit displays of the Photo constituted actionable copyright infringement and that so-called "embedding" does not preclude that conclusion; b) issuing a permanent injunction preventing Advance from making any further unauthorized use or display of the Photo; c) awarding to plaintiff all appropriate damages, including statutory damages, as determined by the Court or jury; d) awarding to plaintiff Advance's profits

15

attributable to the infringements; e) awarding to plaintiff punitive damages; f) awarding to

plaintiff his costs and attorneys' fees; and g) awarding such other relief as the Court deems just.

Dated: November 21, 2016

NORWICK, SCHAD & GOERING

By:_____
Kenneth P. Norwick (KN 4622)
110 East 59th Street
New York, New York 10022
(212) 751-4440
Attorneys for Plaintiff
ken@norwickschad.com
